|,CHEHARDY, Judge.
Plaintiffs, Joseph and Debra Campo, appeal the summary judgment dismissing their action for damages in a slip-and-fall case against defendant, Winn-Dixie Louisiana, Inc. We affirm.
On December 23, 1998, Debra Campo allegedly injured herself when she slipped and fell on a clear liquid, thought to be an egg white, on the floor of the Winn-Dixie grocery store in' Destrehan, Louisiana. She filed suit on June 21, 1999 for her damages.
On September 21, 2000, Winn-Dixie filed a motion for summary judgment contending that the Campos would not be able to bear their burden of proof under La. R.S. 9:2800.6 that Winn-Dixie had actual of constructive notice of the spilled substance because they would not be able to prove the length of time that the liquid was on the floor prior to Mrs. Campo’s fall. In support of its motion for summary judgment, Winn-Dixie offered the plaintiffs’ original petition and Mrs. Campo’s entire deposition.
laThe Campos, in opposition to Winn-Dixie’s motion for summary judgment, offered the depositions of Eugene Dupuy, the location director[1] for Winn-Dixie’s Destrehan store on the date of the accident, and Wayne Thibodeaux, the assistant location director for Winn-Dixie’s Destre-han store, and Mrs. Campo. Further, the Campos offered affidavits from Mrs. Cam-po, Mrs. Morrill (Mrs. Campo’s sister-in-law), and Frederick Treuting, a Winn-Dix-ie produce department employee. The Campos also included a copy of Winn-Dixie’s “zone-check log” for the dairy department and the customer incident investigation form. Finally, after further dis *96 covery, both Winn-Dixie and the Campos supplemented their respective .motions with the depositions of Frederick Treuting and Kathleen Morrill.
In her' deposition, Mrs. Campo testified that, between 5:30 and 6:00 p.m. on December 23, 1998, she injured her knee while shopping in the Winn-Dixie store in Destrehan, Louisiana. She stated that, as she went to get some cheese in the dairy case, she slipped on a substance, which she described as “egg. whites only,” that was on the floor near the dairy case in the rear of the store. She fell “straight down on [her] left knee.” She stated that there was a “sizeable amount” of egg whites on the floor becausé, after she fell, she had a “good bit” on her hand and a “12-inch streak of black from my shoe when I hit the floor.” She did not state that the floor was excessively dirty in any other respect. She also stated that she did not know how the liquid got on the floor or how long the liquid had been on the floor.
She stated that the only Winn-Dixie employee in the immediate area was restocking milk in an adjacent dairy case but he did not witness the accident because he had his back to her while he was working. He did offer her |4assistance when she called out after she fell. She also indicated that the assistant manager, whose name she could not recall, helped her to the warehouse area of the store, offered her ice for her knee, and wrote down her account of the incident.
She did not request or receive medical treatment but she did call her brother and sister-in-law to come to the store to get her. She recalled that she was in the warehouse area for at least 20 minutes before her family arrived. Later that evening, because her knee was very swollen, her husband took her to the emergency room. About ten days later, she visited an orthopedist, who has treated her intermittently since the incident for pain and swelling in her knee.
Eugene Dupuy, the location director at Winn-Dixie’s Destrahan store on the date of the incident, testified in his deposition, regarding Winn-Dixie’s safety procedures for preventing slip-and-fall accidents in its stores. In December of 1998, the procedure in place was the “zone check program,” which requires employees of the various departments to inspect their department, or zone, every 30 minutes to make sure that there were no hazards in their zone that might cause.injury to a customer or employee. Further, if an employee discovers a hazard, that employee must secure the area and eliminate the hazard as quickly as possible to prevent any injuries. Moreover, each department had a “zone-check log” which was to be initialed by the employee performing the zone check upon completion of the zone check. The dairy department’s zone-check log for December 23, 1998, which was offered by the Campos in opposition to Winn-Dixie’s motion for summary judgment, indicated that, beginning at 3:00 p.m., there had been zone checks every 30 minutes in the dairy department that day. Finally, Mr. Dupuy indicated that, although he typed the computer report of Mrs. Campo’s incident, he did not interview Mrs. Campo on the date of the incident.
I sIn his deposition, Wayne Thibodeaux, the assistant location director for Winn-Dixie’s Destrehan store on duty on the day of the incident, stated that, on the evening of December 23, 1998, he was called to the rear of the store and, when he arrived, he saw Mrs. Campo on the floor near the dairy case that housed the juice and eggs. He observed the liquid on the floor, which he thought was juice because there were no yolks or shells in the liquid and the spill was closer to the portion of the dairy case *97 that housed the juice than that which housed the eggs. He and another employee then helped Mrs. Campo into the warehouse area where he offered her ice for her knee and asked her to recount the incident for Winn-Dixie’s records. Finally, he cleaned up the area with paper towels and water, which left the area completely dry.
Lastly, both parties supplemented their respective motions with the depositions of Kathleen Morrill and Frederick Treuting. Mrs. Morrill, Mrs. Campo’s sister-in-law, testified that she inspected the floor area in the dairy area when she and her husband arrived later to get Mrs. Campo. She stated that an area of the floor in the dairy department was “sludgy looking. Like carts going through wet spots.... A lot of tennis shoe prints from people walking through.” She also stated,
Well, the part that struck — ’that I remember the most was by the egg cart. There was an area around one corner of it that was streaky and it had what I would have called broken egg that was halfway wiped up. Streaks of egg. What looked like egg white and a little bit of yellow in it.
She stated that the spill near the dairy case was “circular. It looked like it was something that was poorly wiped and then had tracks going through it.” She did not know exactly where her sister-in-law had fallen in the dairy area but knew that she fell near a corner by a restocking cart. She also did not know how the spill had gotten on the floor nor how long the spill had been on the floor.
| ^Frederick Treuting, a produce department employee at the Destrehan Winn-Dixie at that time, testified in his deposition that he was walking through the warehouse area to throw away trash when he saw his neighbor, Mrs. Campo, crying, in the warehouse. When he entered the area, he also saw the assistant manager Wayne Thibodeaux in the warehouse near Mrs. Campo. Treuting stated that he made sure Mrs. Campo was comfortable and got her a bag of ice for her knee. After he learned that she had fallen, he went to inspect the floor of the dairy department. He recalled that the floor was very dirty in the dairy area:
Well, it was a mess and I saw the streaks from other carts and whatnot around it and through it showing that it had been there for a while. I worked for six years, five years, something like that at Winn-Dixie, so in that time you realize how things are. And as far as cleaning the floors go, you could tell what dirt and smudges had been there for a while. It appeared to me that at that time it had been there for a while, because if you just go through it once it wouldn’t leave there dried markings around it....
Treuting also indicated that when he went to inspect the area, Mr. Thibodeaux was cleaning up the area. He admitted that the marks that he saw on the floor in the dairy area could have been created by people who walked through the area or carts pushed through the area after Mrs. Campo fell. Finally, he stated that he did not know what type of liquid was on the floor or how the liquid got on the floor and further that he was only speculating on the length of time that the liquid was on the floor.
After a hearing on the Winn-Dixie’s motion for summary judgment, the trial judge took the matter under advisement. On October 10, 2001, the trial judge granted summary judgment with the following written reasons:
This matter came before the court on motion for summary judgment filed by the defendant, Winn-Dixie Louisiana, Inc. The case involves an incident that *98 occurred at a grocery store owned by the defendant in Destrehan, Louisiana wherein plaintiff, Debra Campo, allegedly slipped and fell on broken egg debris or spillage located on the store[sic] floor.
|7The plaintiffs’ cause of action is governed by La. R.S. 9:2800.6, which states that a merchant owes a duty to exercise reasonable care to keep aisles, passageways, and floors in a reasonably safe condition. An essential element that the plaintiffs must prove is that the defendant had actual or constructive notice of the condition which caused the damage prior to the occurrence. Constructive notice is specifically defined in the statute to mean that proof must be provided that the hazardous condition existed for such a period of time that it would have been discovered if the merchant had exercised reasonable care.
The defendant contends that the plaintiffs cannot carry their burden of proving constructive notice as required by La. R.S. 9:2800.6. In its supporting memorandum and exhibits, the defendant refers to the deposition testimony of Mrs. Campo in which she was unable to identify any independent witnesses or employees of the defendant who had knowledge of the egg spillage on the floor prior to the accident. Moreover, Mrs. Campo’s testimony revealed that she herself was unable to determine how long the egg spillage was on the floor before she had fallen down.
The defendant cites the Louisiana Supreme Court decision of White v. Wal-Mart Stores, Inc., 97-393 (La.9/9/97), 699 So.2d 1081, and its progeny for the contention that the statutory constructive notice element requires a claimant to come forward with positive evidence as to the duration of time that the alleged damage-causing condition existed prior to the accident. Accordingly, defendant maintains that the plaintiffs are unable to produce such evidence and therefore cannot satisfy all of the necessary elements of La. R.S. 9:2800.6.
In their opposing memoranda, the plaintiffs attempt to challenge the assertion that the defendant did not have constructive notice of the hazardous condition at issue in this case. Specifically, the plaintiffs rely on three affidavits, including that of Ms. [sic] Campo, in which the condition of the floor where Mrs. Campo fell is described as being exceptionally dirty and wet with dried streak marks from grocery carts and shoe prints. The plaintiffs argue that the description of the floor as provided by the affiants indicates that a hazardous condition existed for an unreasonably long period of time sufficient to constitute constructive notice.
The observations of all three affiants, however, were made after the accident occurred. Indeed, the defendant points out in its supplemental memorandum that affiant, Kathleen Morrill, did not arrive at the scene of the accident until approximately 30 minutes after plaintiffs fall. The third affiant, Eric [Frederick] Treuting (who was employed with defendant on the date of the accident), admitted that he did not know how long that alleged injury-causing substance was on the floor and that the streaks that he saw on the floor could have occurred after Ms.[sie] Camp[sic] had fallen down.
IsThe Court finds the defendant’s argument to be well-founded. Although plaintiffs dispute the defendant’s denial of constructive knowledge, the evidence produced by the plaintiffs does not meet the “positive evidence” test required by La. R.S. 9:2800.6. Said evidence is merely innuendo at its least and conclusory at best.
*99 Accordingly, the motion for summary judgment will be granted.
On appeal, the Campos argue that the trial court erred in granting Winn-Dixie’s motion for summary judgment. They contend that the trial court erred in finding that they had not produced sufficient evidence that the egg spillage had been on the floor for a substantial length of time to constitute constructive notice of the hazard to Winn-Dixie. While they admit that they do not know how long the egg white was on the floor prior to Mrs. Campo’s accident, they point to Kathleen Morrill’s testimony that the floor was “sludgy looking” and “streaky” in the dairy department for circumstantial evidence that the spillage was on the floor for a substantial length of time. Further, they rely on Frederick Treuting’s testimony that, based on his years of working at Winn-Dixie, the appearance of the floor in the dairy reflected that the egg spillage had been there for a “substantial period of time” prior to Mrs. Campo’s fall.
In Kennedy v. Wal-Mart Stores, Inc., 98-1939 (La.4/13/99), 733 So.2d 1188, the Louisiana Supreme Court reiterated the slip-and-fall plaintiffs burden of proof, as follows:
In a slip and fall case, the plaintiffs burden of proof is set forth in La. R.S. 9:2800.6. Although the statute was later amended, at the time of the instant accident, it provided in relevant part as follows:
B. In a negligence claim brought against a merchant by a person lawfully on the merchant’s premises for damages as a result of an injury, death, or loss sustained because of a fall due to a condition existing in or on a merchant’s premises, the claimant shall have the burden of proving, and in addition to all other elements of his cause of action, that:
(1) The condition presented an unreasonable risk of harm to the claimant and that risk of harm was reasonably foreseeable;
10(2) The merchant either created or had actual or constructive notice of the condition which caused the damage, prior to the occurrence; and
(3) The merchant failed to exercise reasonable care.
C. Definitions:
(1) ‘Constructive 'notice’ means the condition existed for such a period of time that it would have been discovered if the merchant had exercised reasonable care.
In White, we found that subsection (B)(2) of the statute clearly and unambiguously requires proof by plaintiff that the merchant either created the condition causing the damage or, prior to the occurrence, had actual or constructive notice of the condition. Moreover, we noted that in subsection (C)(1) of the statute, the legislature has set forth a clear and unambiguous definition of the term ‘constructive notice’:
There is a temporal element included: ‘such a period of time ... ’ The statute does not allow for the inference of constructive notice absent some showing of this temporal element. The claimant must make a positive showing of the existence of the condition prior to the fall. A defendant merchant does not have to make a positive showing of the absence of the existence of the condition prior to the fall. Notwithstanding that such would require proving a negative, the statute simply does not provide for a shifting of the burden.
Though there is no bright line time period, a claimant must show that ‘the condition existed for such a period of *100 time .’ Whether the period of time is sufficiently lengthy that a merchant should have discovered the condition is necessarily a fact question; however, there remains the prerequisite showing of some time period. A claimant who simply shows that the condition existed without an additional showing that the condition existed for some time before the fall has not carried the burden of proving constructive notice as mandated by the statute. Though the time period need not be specific in minutes or hours, constructive notice requires that the claimant prove the condition existed for some time period prior to the fall. This is not an impossible burden. White, 97-0393 at pp. 4-5, 699 So.2d at 1084-85. (Emphasis in original).
Kennedy, 733 So.2d at 1190-1191.
ImLa. C.C.P. art. 966 B provides that a summary judgment “shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law.” La. C.C.P. art. 966 A(2) provides that summary judgment “is designed to secure the just, speedy, and inexpensive determination of every action,” and is favored. Importantly, La. C.C.P. art. 966 C(2) states:
The burden of proof remains with the movant. However, if the movant will not bear the burden of proof at trial on the matter that is before the court on the motion for summary judgment, the movant’s burden on the motion does not require him to negate all essential elements of the adverse party’s claim, action, or defense, but rather to point out to the court that there is an absence of factual support for one or more elements essential to the adverse party’s claim, action, or defense. Thereafter, if the adverse party fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact.
Appellate courts review summary judgments de novo, using the same criteria applied by trial courts to determine whether summary judgment is appropriate. Pizani v. Progressive Ins. Co., 98-225 (La.App. 5 Cir. 9/16/98), 719 So.2d 1086, 1087.
Here, Winn-Dixie attached Mrs. Cam-po’s deposition to its motion for summary judgment. Mrs. Campo admitted that she did not know how long the substance was on the floor. In her deposition, she stated that, after she fell, she saw a black mark that was caused by her shoe when she slipped in the liquid on the floor. She did not, however, indicate that she saw shopping-cart tracks or footprints in the area of the spill prior to her fall or while she was seated on the floor after she fell. The Campos, in opposition to Winn-Dixie’s motion, offered several depositions as well as affidavits from Mrs. Morrill and Frederick Treuting, who both indicated that when they inspected the floor after Mrs. Campo fell and In that the floor was messy with footprints and shopping-cart tracks. Neither had seen the floor immediately prior to Mrs. Campo’s fall. Thus, it is logical that the black marks and tracks that Mrs. Morrill and Mr. Treuting saw were created after Mrs. Campo fell.[2]
In this case, the Campos produced evidence that Mrs. Campo fell on a liquid *101 on the floor of Winn-Dixie’s Destrehan store. Further, Mrs. Campo stated that a Winn-Dixie employee was working in the area, but admitted that he did not see her fall. In all of the supporting documents, the Campos presented absolutely no evidence as to the length of time the liquid had been on the floor before Mrs. Campo’s fall. Therefore, the Campos did not produce factual support sufficient to establish that, at trial, they could bear their substantial evidentiary burden of proof that Winn-Dixie had constructive notice of the hazardous condition. Because the Campos could not have proven an essential element of their cause of action under La. R.S. 9:2800.6, the district court properly granted summary judgment in favor of Winn-Dixie.
For the foregoing reasons, the judgment of the trial court is affirmed. All costs in this court are assessed to the appellant.

AFFIRMED.

. Dupuy stated that the title of “location director” at Winn-Dixie is equivalent to store manager.

. In their brief, the Campos cite this Court's opinion in Beninate v. Wal-Mart Stores, Inc., 97-802 (La.App. 5 Cir. 12/10/97), 704 So.2d 851, writ denied, 713 So.2d 470 (La.1998), for the proposition that "circumstantial evidence of the black track marks was sufficient to satisfy the requirement of constructive notice.” However, Beninate is distinguishable *101 from this case. In Beninate, the plaintiff testified that the french fry that she slipped on was "black” and that it appeared from the condition of the floor around the french fry that carts had rolled over it. In this case, Mrs. Campo did not testify that there were track marks or footprints in the area that she fell. The testimony that plaintiffs rely on came from two people who observed the scene well after Mrs. Campo's fall, which indicates that the tracks, if present, were created after her fall.